Docket Nos. 87101–Agenda 37–September 1999.

THE CITY OF CHICAGO HEIGHTS, Appellee, v. LIVING WORD OUTREACH FULL GOSPEL CHURCH AND

 MINISTRIES, INC., Appellant.

Opinion filed March 22, 2001.

JUSTICE McMORROW delivered the opinion of the court:

At issue in this zoning case is whether the City of Chicago Height’s denial of a special use permit to Living Word Outreach Full Gospel Church and Ministries, Inc. (Living Word), was unlawful.

BACKGROUND

The property at issue in this appeal is located at 400 West Lincoln Highway and consists of a one-story, 4,000-square-foot brick building and an adjoining parking lot. The property is on the south side of Lincoln Highway, a four-lane road that runs east and west through the City. The building on the property was constructed in 1954 for use as a Masonic temple. To the west of the property, and across the street to the north, are commercial buildings, such as a carry-out Italian restaurant and a veterinary office. To the east are buildings that house a mix of residential and commercial uses. Immediately behind the property, to the south, are single-family homes.

The property is located in a zoning district defined under the City’s zoning ordinance as B-2, or “limited service business district.” Churches are listed in the City’s zoning ordinance as a special use within B-2 districts. Churches may locate in a B-2 district by obtaining a special use permit from the City.

Under the City’s zoning ordinance, the authority to grant or deny an application for a special use permit is reserved to the city council. Prior to the council taking action on an application for a special use permit, the City’s zoning board of appeals and the City’s plan commission must review the application and make a recommendation. These recommendations are forwarded to the city council, which then decides whether to approve or deny the application.

The City’s zoning ordinance states that the zoning board of appeals may recommend to the city council that a special use be allowed only if the following six criteria are satisfied:

“(a) That the establishment, maintenance or operation of the special use will not be unreasonably detrimental to or endanger the public health, safety, morals, comfort or general welfare;

(b) That the special use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted nor substantially diminish and impair property values within the neighborhood;

(c) That the establishment of the special use will not impede the normal and orderly development and improvement of surrounding property for uses permitted in the district;

(d) That adequate utilities, access roads, drainage and/or other necessary facilities have been or are being provided;

(e) That adequate measures have been or will be taken to provide ingress and egress so designed as to minimize traffic congestion in public streets;

(f) That the special use shall in all other respects conform to the applicable regulations of the district in which it is located, except as such regulations may in each instance be modified by the city council pursuant to the recommendations of the zoning board of appeals.” Chicago Heights Municipal Code, app. A, Zoning, §12–6.6 (1973).

In January 1996, after taking possession of the property at 400 West Lincoln Highway, Living Word submitted an application to the City for a special use permit. A public hearing was held before the City’s zoning board of appeals on March 13, 1996. After the hearing, the board forwarded Living Word’s application to the City’s plan commission. On March 27, 1996, the plan commission recommended that Living Word’s application for a special use permit be denied. On April 3, 1996, the zoning board of appeals also recommended that the application be denied. Finally, on April 15, 1996, the city council agreed with the recommendations of the plan commission and the zoning board of appeals and denied Living Word’s application for a special use permit.

The city council ultimately denied Living Word’s application based upon a comprehensive development plan adopted by the City in December 1995. This plan targeted West Lincoln Highway, the area in which the church is located, for development as a commercial corridor. The concern of the council was that granting a special use permit for a noncommercial use, such as a church, would be at odds with the goals of the comprehensive plan.

Although the city council denied Living Word’s application for a special use permit, the church continued to hold services in the building at 400 West Lincoln Highway. Eventually, the City filed suit in the circuit court of Cook County, seeking to permanently enjoin the church from continuing its services. Living Word responded with 14 affirmative defenses which were later refiled in a 14-count counterclaim. Three of the counts in the counterclaim are relevant here. Count VI of the counterclaim alleged that the city council’s denial of Living Word’s application for a special use permit violated Living Word’s right to the free exercise of religion under the first and fourteenth amendments of the United States Constitution. Count XIII alleged that Living Word was merely continuing the Masons’ permitted nonconforming use of the property. Count XIV alleged that the city council’s denial of Living Word’s application for a special use permit was “arbitrary, capricious and unreasonable in light of [
sic
] fact that use of the property by [Living Word] meets standards (a) through (f) of section 12–6.6 of the zoning code of the City.”

A bench trial was held in December 1997. During this trial, the court heard testimony from several witnesses, including Maria Arbeen, a real estate appraiser. Arbeen testified that, in her opinion, Living Word had satisfied all the criteria for obtaining a special use permit listed in the City’s zoning ordinance.

The court also heard testimony from Joseph Christofanelli, the city planner for the City of Chicago Heights. Christofanelli stated that the City was suffering economic problems and was approximately $57 million in debt. Because of this, Christofanelli explained, the City needed to concentrate on developing commercial areas that would generate real estate and sales taxes. The West Lincoln Highway corridor was of particular importance to the City because that corridor was the City’s best commercial, tax-revenue-generating area. Christofanelli stated that permitting any noncommercial use within the West Lincoln Highway corridor would be detrimental to surrounding commercial properties because these properties would miss out on the “spill-over effect” whereby customers patronize more than one business in an area. Christofanelli stated that Living Word’s application for a special use permit was denied because “the church was something we had not envisioned for that particular corridor, and here, again, that’s based upon the Comprehensive Plan.”

The court heard testimony similar to Christofanelli’s from Steven Albert, a real estate appraiser. Albert stated that any noncommercial use in the West Lincoln Highway corridor would be incompatible with, and detrimental to, the goals of the City’s comprehensive plan.

In addition to the foregoing testimony, the circuit judge also reviewed several exhibits, including the City’s zoning ordinance, the City’s comprehensive plan, the City’s official zoning map, Living Word’s special use application, minutes from city council meetings, minutes from meetings of the City’s zoning board of appeals, minutes from a meeting of the City’s plan commission, and numerous diagrams and letters.

Following arguments, the circuit court entered an order on December 12, 1997, denying the City’s request for a permanent injunction.

In oral remarks given before he entered his order, the circuit judge first examined the criteria to obtain a special use permit listed in the City’s ordinance. After reviewing these criteria, the circuit judge stated, “I think that the city standards here are indeed reasonable standards. But I think that I agree with the church that it has met those standards and I think the evidence fully supports that, and that is the evidence before this court. I just don’t buy at all this idea that [Living Word has] not met these standards. So it is just clear that [Living Word has] met them.” The judge then stated, “[T]he next question is what happens next; and applying the case law to the facts that we have here, one first looks at the leading case, and the leading case and I think a case that is directly on point is 
Columbus Park Congregation of Jehovah’s Witness, Inc. v. Board of Appeals of the City of Chicago
, [25 Ill. 2d 65 (1962)], and there are many of the same factors in our situation that were present in that case.”

Columbus Park
, which relied heavily upon the first amendment “right of freedom of religion” (
Columbus Park
, 25 Ill. 2d at 71), held that the Chicago zoning board of appeals’ denial of a special zoning permit application to a church located in a commercial block was “not consonant with the constitutional guarantees of freedom of religion.” 
Columbus Park
, 25 Ill. 2d at 73. After reading much of the 
Columbus Park
 opinion into the record, the circuit judge in the case at bar noted that “[
Columbus Park
] is directly on point, is binding on this court, and controls this action. Religious freedom is indeed a very important part of this country. Some people think even the most important part of the constitutional guarantees in this country, and I want to say here–and I don’t mean to criticize [the City]. I really don’t. But I think at the same time that this special use will not really harm [the City].”

Following these statements, the circuit court issued a written order, which, on its face, was not based upon the right to free exercise of religion:

“This court having heard all the testimony and carefully considered all the evidence and arguments finds in favor of the Plaintiff City on the issue of continuation of a legal non-conforming use and in favor of the Defendant Church on the issue of whether the Special Use Permit should have been granted and finds that the Permit was improperly denied. The Court finds that it need not reach the constitutional defenses raised by the church. This is a final and appealable order and no just reason exists to delay enforcement or appeal.”

On December 16, 1997, the City filed a notice of appeal from the circuit court’s December 12 order.

On January 7, 1998, Living Word filed a “Motion to Determine if Attorneys’ Fees, Costs and Other Relief is Awardable” in the circuit court. In this motion, Living Word argued that it was entitled to attorney fees because, despite the wording of the written order of December 12, the circuit court had essentially declared that the City’s refusal to grant it a special use permit violated the free exercise clause of the first amendment of the United States Constitution. See 
Caputo v. City of Chicago
, 113 Ill. App. 3d 45, 48 (1983) (attorney fees may be awarded by state courts under 42 U.S.C. §1988(b) (1994) where federal constitutional law is the basis for a decision in favor of the claimant).

During a hearing on Living Word’s motion, the court explained that, when it denied the City’s request for an injunction in December 1997, it “intended to base the decision on free exercise of religion as did the Supreme Court in the 
Columbus Park
 case.” The court stated, “I can see what I should have done at that time is to make a finding with regard to the exact theory that the church was seeking to make a finding on. I think that that is count 6 [Living Word’s claim under the first amendment].” The court went on to state, “I’m now making further finding that relief is due explicitly under Count 6, not only, therefore, the relief that was granted with respect to the order that was signed before which is really incomplete.” The circuit court then entered an order, dated February 26, 1998, which states, “Pursuant to 
Columbus Park
, 25 Ill. 2d 65 (1962), this Court grants judgment to [Living Word], on Count VI of the Counter-Complaint insofar as Count VI alleged that the City *** violated the U.S. Constitution in denying [Living Word’s] request for a special use permit.” The order awarded Living Word attorney fees based on the court’s finding “that the Free Exercise Clause of the 1st Amendment was violated by the City’s actions.” The order also granted Living Word a permanent injunction against the City, which prohibited the City from enforcing its zoning ordinance against the church at its location at 400 West Lincoln Highway. On March 16, 1998, the City filed a notice of appeal from the circuit court’s February 26 order.

The appellate court consolidated the City’s appeals from the circuit court’s December 12 and February 26 orders and reversed the judgment of the circuit court. In its opinion, the appellate court first addressed whether the circuit court lacked jurisdiction to enter the February 26 order. Discussing this issue, the appellate court concluded that the circuit court’s December 12 order was a final and appealable order, even though the circuit court had failed to mention Living Word’s counterclaim in the written order or to rule on Living Word’s “constitutional defenses.” The appellate court stated:

“By *** finding that the Church met the requirements for a special use permit, the court effectively ruled on counts XIII and XIV of the counterclaim. Although the court’s oral remarks before entry of the order suggested that the city’s denial violated the Church’s constitutional rights, the remarks were not the reason for the court’s finding that the denial was improper. We read the statements made in open court and the wording of the December 12 order as a finding by the court that the Church met the requirements for a special use permit. Because the requirements were met, the court ruled that the Church’s application should have been approved and the denial was arbitrary and capricious. *** The December 12 order terminated the controversy between the parties.” 302 Ill. App. 3d at 568-69.

Since the December 12 order was final and appealable, the appellate court concluded that the City’s filing of the notice of appeal from that order divested the circuit court of jurisdiction on all substantive matters before the court. 302 Ill. App. 3d at 569. Then, recognizing the rule that orders entered after filing of a notice of appeal may be valid if they do not expand or modify the substantive issues before the reviewing court, the appellate court held that the February 26 order “is a nullity because it expanded and modified the December 12, 1997, order. The order purported to rule on claims that the court determined it need not reach in its December 12 ruling and over which it no longer had jurisdiction.” 302 Ill. App. 3d at 569. Consequently, the appellate court vacated the circuit court’s February 26 order “to the extent that [it] makes additional findings and grants additional injunctive relief.” 302 Ill. App. 3d at 570.

The appellate court then turned to the substantive issue presented by the circuit court’s December 12 order: “whether the city’s denial of the special use permit was proper.” 302 Ill. App. 3d at 570. In addressing this issue, the appellate court did not discuss the City’s criteria for obtaining a special use permit or the trial court’s findings that the church had met those criteria. Nor did the appellate court apply the principles of the free exercise clause of the first amendment, as was done in 
Columbus Park
. Instead, the appellate court resolved the case under the Illinois Religious Freedom Restoration Act (RFRA) (775 ILCS 35/1 
et seq
. (West 1998)).

Under the Illinois RFRA, a law which substantially burdens religious freedom is impermissible unless the law serves a compelling governmental interest and is the least restrictive means of furthering that interest. 775 ILCS 35/15 (West 1998). The appellate court concluded that the City had a compelling interest to “invigorate the commercial corridor [in which Living Word was located] to regenerate declining revenues and create a strong tax base.” 302 Ill. App. 3d at 571-72. The appellate court further determined that, because the City’s zoning ordinance permitted churches to locate in 60% of the City without a special use permit, “the least restrictive means [were] used to further the city’s interest[s].” 302 Ill. App. 3d at 572. Because the City satisfied the compelling interest test under the Illinois RFRA, the appellate court evidently concluded that there was no remaining basis, either under the terms of the City’s zoning ordinance or under the first amendment, by which Living Word could prevail. The appellate court therefore did not address these latter issues but, instead, simply concluded that the circuit erred in finding that the city council improperly denied the special use permit. We allowed Living Word’s petition for leave to appeal. 177 Ill. 2d R. 315(a).

We subsequently granted the following organizations leave to submit briefs as 
amici curiae
: (1) the American Jewish Committee, American Jewish Congress Midwest Region, Anti-Defamation League, Catholic Conference of Illinois, Christian Legal Society, The Church of Jesus Christ of Latter-Day Saints, Concerned Christian Americans, The Greek Orthodox Diocese of Chicago, Illinois Conference of Churches, Illinois Family Institute, and Justice Fellowship; (2) Vineyard Christian Fellowship of Evanston; and (3) Civil Liberties for Urban Believers. 155 Ill. 2d R. 345. We also allowed the Attorney General leave to intervene to defend the constitutionality of the Illinois RFRA. 775 ILCS 35/1 
et seq
. (West 1998); 134 Ill. 2d R. 19.

ANALYSIS

On appeal, Living Word contends that the appellate court erred in its application of the Illinois RFRA and, alternatively, that the city council’s refusal to grant Living Word a special use permit violated the church’s rights to free exercise of religion, free speech, freedom of assembly and equal protection under the federal and state constitutions.
(footnote: 1) Initially, however, Living Word argues that the city council’s denial of its application for a special use permit was arbitrary and capricious as a matter of general zoning law. Before we can address this issue, we must discuss the appropriate standard of review.

Standard of Review

It is widely held that when a zoning ordinance, such as the one in the case at bar, reserves the power to grant or deny an application for a special use permit in a legislative body, that body acts in an administrative capacity rather than a legislative capacity when it rules on a permit application. See, 
e.g.
, K. Young, Anderson’s American Law of Zoning §21.10, at 718-19 (4th ed. 1996) (“When permit issuing authority is retained by the legislature, the granting or denial of special permits by that body is regarded by most courts as an administrative rather than a legislative function”); 83 Am. Jur. 2d 
Zoning & Planning
 §980, at 819 (1992) (“The granting or denial of special permits by the legislature is regarded by most courts as an administrative rather than a legislative function”). When a legislative body acts administratively in ruling on a permit application, its decision is subject to general principles of administrative review: “As the legislature is acting in an administrative capacity, it must follow the zoning regulations, and its actions are reviewable, and subject to judicial reversal if they are without support in the record or are otherwise arbitrary or unreasonable.” K. Young, Anderson’s American Law of Zoning §21.10, at 720 (4th ed. 1996). In particular, the decision to grant or deny the permit application may be reviewed to determine whether the decision was made in compliance with any criteria listed in the zoning ordinance. K. Young, Anderson’s American Law of Zoning §21.10, at 725 (4th ed. 1996).

Although the clear weight of authority in the United States holds that a legislative body acts administratively when it rules on applications for special use permits, there is authority in this state which holds that the granting or denial of a permit application is a legislative act. For example, a line of cases from this court holds, with respect to the legislative bodies of counties, that the decision to grant or deny an application for a special use permit is a legislative act. See, 
e.g.
, 
Kotrich v. County of Du Page
, 19 Ill. 2d 181 (1960) (county board of supervisors acted in a legislative capacity in granting a special use permit). When a legislative body acts in a legislative capacity in ruling on a permit application, its decision is not subject to principles of administrative review. Instead, the legislative body’s decision is reviewed for arbitrariness as a matter of substantive due process under the six-part test set forth in
 La Salle National Bank v. County of Cook
, 12 Ill. 2d 40 (1957). In this context, the landholder’s compliance with any special use criteria listed in the zoning ordinance is merely a factor to consider, not the dispositive consideration, in determining whether the granting or denial of the permit application was arbitrary and unreasonable. See 
National Pride Equipment, Inc. v. Village of Niles
, 109 Ill. App. 3d 639, 644-45 (1982).

In the present case, neither Living Word nor the City has clearly articulated how the city council’s decision to deny Living Word’s application for a special use permit should be reviewed. Count XIV of Living Word’s counterclaim refers solely to the special use criteria listed in the City’s zoning ordinance, thus suggesting that Living Word sought an administrative-type review of the city council’s action. Moreover, in their briefs before this court, both Living Word and the City discuss whether Living Word satisfied the special use criteria of the City’s zoning ordinance at some length. However, both parties also refer to the 
LaSalle
 substantive due process test or cases which have applied that test. Somewhat confusingly, Living Word suggests that “[w]hether the church met [the City’s] special use standards is a fact intensive inquiry involving first the language of the Chicago Heights ordinance, and if those provisions are not met, then an application of the six (6) factors set forth in 
LaSalle
.” Neither party has briefed or argued that the city council’s decision to deny Living Word’s application be viewed definitively as an administrative or legislative act.

We note that there is considerable force to the view that the decision of a legislative body to grant or deny an application for a special use permit, whether made by a county or municipality, should be viewed as an administrative act. The decisions from this court which have held to the contrary have been criticized. See, 
e.g.
, O. Browder, R. Cunningham, G. Nelson, W. Stoebuck & D. Whitman, 
Note on “Special Exceptions,” “Special Uses,” or “Conditional Uses,”
 in Basic Property Law 1184, 1186 (5th ed. 1989) (
Kotrich
’s statement that “ ‘[s]ince the board of supervisors is a legislative body, precise standards to govern its determination are not required’ will not bear analysis. The decision to grant or deny a ‘special use’ permit is clearly ‘administrative’ or ‘quasi-judicial’ rather than ‘legislative,’ whether the decision is made by a purely ‘administrative’ agency such as the zoning board of adjustment or a local governing body which may exercise both ‘legislative’ and ‘administrative’ powers”). Further, our appellate court has suggested that, in light of amendments made to the Illinois Municipal Code governing special uses, the General Assembly has indicated a desire to treat the application process for a special use permit as an administrative function, at least with respect to municipalities. See 
Geneva Residential Ass’n v. City of Geneva
, 77 Ill. App. 3d 744 (1979); but see 
National Pride
, 109 Ill. App. 3d at 644-45.

However, we need not decide, in this case, whether the city council’s decision to deny Living Word’s application for a special use permit was an administrative or legislative act. As discussed below, the result of this case is the same, regardless of how the city council’s action is characterized. Accordingly, we leave the resolution of this issue to a case where it has been properly briefed and argued.

Administrative Action

In general, a “special use” is a type of property use that is expressly permitted within a zoning district by the controlling zoning ordinance so long as the use meets certain criteria or conditions.“The purpose of special uses is to provide for those uses that are either necessary or generally appropriate for a community but may require special regulation because of unique or unusual impacts associated with them.” S. Connor, 
Zoning
, in Municipal Law & Practice §13.17 (Ill. Inst. for Cont. Legal Educ. 2000). A church may be an appropriate special use because, depending upon its size and location, it may create traffic or parking problems within the neighborhood in which it is located. For example, the number of parking spaces needed by a church may vary considerably depending upon the availability of parking spaces in the neighborhood at the time the church holds services. Thus, although a church might be considered a desirable and appropriate use within a zoning district, the municipality may classify it as a special use and may require, for example, that parking problems be resolved before granting a special use permit to a property owner that would allow the owner to use the property as a church. See generally 3 E. Ziegler, Rathkopf’s Law of Zoning and Planning, ch. 41 (4th ed. 1992); 3 K. Young, Anderson’s American Law of Zoning, ch. 21 (4th ed. 1996). In Illinois, municipal special uses are authorized by section 11–13–1.1 of the Illinois Municipal Code (65 ILCS 5/11–13–1.1 (West 1994)).

Special uses must be clearly distinguished from use variances. “[A] variance is ‘authority extended to a property owner to use his property in a manner forbidden by the zoning enactment,’ ” generally upon a showing of hardship. 3 K. Young, Anderson’s American Law of Zoning §20.03, at 416 (4th ed. 1996), quoting 
Mitchell Land Co. v. Planning & Zoning Board of Appeals
, 140 Conn. 527, 532, 102 A.2d 316, 319 (1953). A special use, on the other hand, “ ‘allows [a property owner] to put his property to a use the enactment expressly permits.’ ” 3 K. Young, Anderson’s American Law of Zoning §20.03, at 416 (4th ed. 1996), quoting 
Mitchell Land Co. v. Planning & Zoning Board of Appeals
, 140 Conn. 527, 532-33, 102 A.2d 316, 319 (1953). In sharp contrast to a variance, the inclusion of a special use within a zoning ordinance “ ‘is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood.’ ” 3 K. Young, Anderson’s American Law of Zoning §21.13, at 126 (4th ed. 1999 Supp.), quoting 
Twin County Recycling Corp. v. Yevoli
, 90 N.Y.2d 1000, 1001, 688 N.E.2d 501, 502 (1997). “A special exception use is a ‘permitted use’ when allowed under a special permit. Thus, there has been a local legislative determination that the use, as such, is neither inconsistent with the public’s health, safety, morals or general welfare, nor out of harmony with the town’s general zoning plan.” 3 E. Ziegler, Rathkopf’s Law of Zoning and Planning §41.08, at 41–34 (4th ed. 1992); see also 83 Am. Jur. 2d 
Zoning & Planning
 §974, at 814 (1992) (“Where a zoning ordinance authorizes a business as a special use, such authorization is tantamont [
sic
] to a legislative conclusion that the use is appropriate in the district”). Thus, in the instant case, the City zoning ordinance’s authorization of churches as a special use along West Lincoln Highway constitutes a legislative finding that churches, as such, are compatible with the surrounding property uses in that area.

In the case at bar, the city council’s reason for denying Living Word’s application for a special use permit is not in dispute. Stated simply, the city council denied Living Word’s application because it believed that all noncommercial uses were incompatible uses along West Lincoln Highway. The council based this belief on the City’s then recently adopted comprehensive development plan.
(footnote: 2) This plan, adopted by the City approximately one month before Living Word submitted its application for a special use permit, addresses many areas of concern for the City, including demographic and economic trends occurring within the City. One portion of the plan is devoted to land use and highlights the West Lincoln Highway corridor as an area that should be “improved as an auto commercial area oriented to a regional clientele.” Relying on this stated goal, the city council concluded that to grant a special use permit for any noncommercial use, including churches, along West Lincoln Highway would frustrate the plan to develop that area as a strong commercial corridor. For this reason, the council denied Living Word’s application.

It must be emphasized that the city council’s objection to Living Word’s application for a special use permit did not center on any attribute of Living Word that is unique to this particular church or its facilities. The council did not conclude, for example, that the church will impede the orderly development of surrounding properties or lower their value because the church building is unusually large, or because the church’s congregation generates traffic problems along West Lincoln Highway. Instead, Living Word’s application was denied because the council believed that any noncommercial use of property located in the West Lincoln Highway corridor would have a negative effect on the commercial development of that corridor and, therefore, that all noncommercial uses should be completely excluded.

It is clear that the city council’s rationale for denying Living Word’s special use permit application is at odds with the legislative intent expressed in the City’s zoning ordinance. According to the zoning ordinance, and in contrast to the council’s explanation for denying Living Word’s application, churches are not a 
per se
 incompatible use along Lincoln Highway. Quite the contrary, the City zoning ordinance’s inclusion of churches as a special use in the West Lincoln Highway corridor “is equivalent to a legislative finding that [such a] use is one that is in harmony with the other uses permitted in the district.” 3 E. Ziegler, Rathkopf’s Law of Zoning and Planning §41.05, at 41–21 through 41–22 (4th ed. 1992).

In light of the above, the question arises as to whether the city council, in denying Living Word’s application for a special use permit, could legitimately set the legislative intent expressed in the zoning ordinance to one side and, instead, rely upon the developmental goals expressed in the comprehensive plan as the basis for its decision. For the following reasons, we believe the answer to this question is no.

In the instant case, if the decision of the city council to deny Living Word’s application for a special use permit is viewed as an administrative act, then that decision cannot be upheld on the basis proffered by the city council, 
i.e.
, that all noncommercial uses are incompatible in the West Lincoln Highway corridor. The City’s zoning ordinance states that churches, as such, are a compatible use in the West Lincoln Highway corridor. As noted previously,  acting administratively, the city council must adhere to the regulations and intent of the City’s zoning ordinance. See K. Young, Anderson’s American Law of Zoning §21.10, at 720 (4th ed. 1996) (“As the legislature is acting in an administrative capacity, it must follow the zoning regulations”).Thus, if we were to uphold the council’s decision, we would be inappropriately permitting the council to suspend “the expressed intent of the ordinance.” E. Ziegler, Rathkopf’s Law of Zoning and Planning §41.08, at 41–35 (4th ed. 1992) (discussing 
Grand Chapter of Phi Sigma Kappa v. Grosberg
, 30 A.D.2d 887, 291 N.Y.S.2d 606 (1968)).

The principle that administrative zoning agencies must adhere to the intent of the zoning ordinance was noted in 
Columbus Park Congregation of Jehovah’s Witnesses, Inc. v. Board of Appeals
, 25 Ill. 2d 65 (1962). In 
Columbus Park
, the Chicago board of zoning appeals denied an application for a special use permit to a church that had purchased two store buildings located in a commercial block. The board based its decision, in part, on the conclusion that the church would “break *** the continuity of the line of small businesses” located on the block. 
Columbus Park
, 25 Ill. 2d at 73. On appeal, the principle claim at issue was whether the zoning board of appeals’ denial of the application violated the church’s constitutional rights, and the case was decided primarily on the free exercise clause of the first amendment.
(footnote: 3) However, the opinion also noted that the reasoning offered by the board for denying the permit application, 
i.e.
, that the church would disrupt business continuity, was not “consistent with the intent of the ordinance.” 
Columbus Park
, 25 Ill. 2d at 73. Any church located in a district zoned for business use would break the “business continuity” of surrounding commercial properties. By including churches as special uses, the Chicago zoning ordinance clearly intended to allow some churches in the relevant business districts. Because the rationale offered by the board, if upheld, would result in the exclusion of all churches from those districts, that rationale was inconsistent “with the intent of the ordinance.”

Because special uses, as such, are considered compatible with other uses in the zoning district in which they are included, it is generally held that an application for a special use permit may not be denied on the ground that the use is not in harmony with the surrounding neighborhood. 3 K. Young, Anderson’s American Law of Zoning §21.13, at 743 (4th ed. 1996). Instead, a special use permit “ ‘must be denied when it is determined from the facts and circumstances that the grant of the requested special exception use would result in an adverse effect upon adjoining and surrounding properties unique and different from the adverse effect that would otherwise result from the development of such a special exception use located anywhere within the zone. Thus, *** the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any 
adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone
.’ ” (Emphasis in original.) 3 E. Ziegler, Rathkopf’s Law of Zoning and Planning §41.08, at 41–36 (4th ed. 1992), quoting 
People’s Counsel v. Mangione
, 85 Md. App. 738, 749-50, 584 A.2d 1318, 1323 (1991).

There is nothing of record in this case which would indicate that Living Word’s use of its property as a church would have any adverse effects on surrounding properties above and beyond those that would  inherently be associated with any church located in the West Lincoln Highway corridor. Accordingly, in the case at bar, if the city council’s denial of the permit application is considered an administrative decision, it cannot be upheld.

The existence of the comprehensive plan, and the council’s reliance upon that plan, does not alter this conclusion. The special use criteria in the City’s zoning ordinance do not include conformance with the comprehensive plan as a requirement that must be met before a special use permit may be granted. See E. Ziegler, Rathkopf’s Law of Zoning and Planning §41.08, at 41–37 (4th ed. 1992) (“Zoning ordinances may expressly provide as a standard for issuance of a special permit that the proposed use at the particular location be compatible with or not negatively impact the local comprehensive zoning plan”). Moreover, the City’s zoning ordinance is law; the comprehensive plan is not. As our Municipal Code explains, “[an official comprehensive] plan shall be advisory and in and of itself shall not be construed to regulate or control the use of private property in any way, except as to such part thereof as has been implemented by ordinances duly enacted by the corporate authorities.” 65 ILCS 5/11–12–6 (West 1994); see also 
Chase v. City of Minneapolis
, 401 N.W.2d 408, 413 (Minn. App. 1987) (incompatibility with comprehensive plan insufficient basis for denying conditional use permit); 
Amoco Oil Co. v. City of Minneapolis
, 395 N.W.2d 115, 118 (Minn. App. 1986) (same). Acting administratively, the city council is bound by the City’s zoning ordinance, not the comprehensive plan. Thus, the city council’s reliance on the comprehensive plan could not justify the decision to deny Living Word’s application for a special use permit.

Legislative Action

Even if one views the city council’s decision to deny Living Word’s application as a purely legislative act, that decision cannot be sustained under the justification offered by the city council. The City has emphasized that the council’s decision to deny Living Word’s application for a special use permit was based on a desire to exclude all noncommercial uses from the West Lincoln Highway corridor and not on any objection or ill-will directed to Living Word in particular. Further, as the City has made clear on appeal, the city council does not intend to apply this policy of excluding noncommercial uses from the West Lincoln Highway corridor on an 
ad hoc
 basis, but will, instead, consistently deny all noncommercial applications for special use permits. It is clear, therefore, that to uphold the rationale offered by the council for denying Living Word’s application for a special use permit would result in the effective amendment of the City’s zoning ordinance. Adopting the council’s reasoning would completely remove churches from the list of special uses set forth in the City’s zoning ordinance. Other noncommercial uses which are listed as special uses under the zoning ordinance, such as public parks and public libraries, would also be eliminated. A new zoning district, one exclusively commercial in character, would thus be created in the West Lincoln Highway corridor. Under the present circumstances, this 
de facto
 amendment of the City’s zoning ordinance cannot be allowed.

The City’s zoning ordinance requires that certain mandatory procedures regarding notice and hearing be completed before any amendment may be made to the zoning ordinance. For example, section 12–11.3 of the ordinance requires the zoning board of appeals to hold “at least one public hearing on [a] proposed amendment” to the zoning ordinance. Chicago Heights Municipal Code, Appendix A, Zoning, §12–11.3 (1973). Section12–11.1 requires the zoning board of appeals to give notice of the public hearing “to the applicant and to the owners or occupants of other properties which may be affected as determined by the zoning board of appeals.” Chicago Heights Municipal Code, Appendix A, Zoning, §12–11.1 (1973). Such notice “shall be in writing and shall give time, place and purpose of such hearing.” Further, under section 12–11.2, “[t]he zoning officer shall cause a notice of time, place and purpose of such hearing to be published in a newspaper of general circulation within [the City], not more than thirty (30) days nor less than fifteen (15) days in advance of such hearing.” Chicago Heights Municipal Code, Appendix A, Zoning, §12–11.2 (1973). See also 65 ILCS 5/11–13–14 (West 1994) (municipal zoning amendments must be made with notice and hearing).

None of the foregoing procedures, designed to safeguard the rights and interests of the public, were undertaken in the case at bar. The city council may not arbitrarily ignore these mandatory procedural prerequisites to amending the City’s zoning ordinance. See, 
e.g.
, 
In re Application of the County Collector
, 132 Ill. 2d 64 (1989); see also 
Martin v. City of Greenville
, 54 Ill. App. 3d 42, 45 (1977) (“Corporate authorities must exercise their power to amend a zoning ordinance in a proper manner and they must comply with the statutory requirements of notice and hearing”). It would be fundamentally erroneous, and unwise as a matter of precedent, to hold that the city council may employ the special use application process as a means to amend the zoning ordinance. 

Again, the city council’s reliance on the comprehensive plan does not change this result. As it is not law, the comprehensive plan cannot override the procedural prerequisites to amending the City’s zoning ordinance. Moreover, we note that the comprehensive plan itself recognizes that it is not controlling legal authority and that the zoning ordinance must be amended if the goals of the comprehensive plan are to be met. The comprehensive plan points out that “[t]he City’s current zoning regulations were originally adopted in 1954. Although the ordinance has been incrementally amended and updated over the last 40 years, it has not received any comprehensive review or amendment.” Thus, a “high priority” for the City, according to the plan, is to “[r]evise the zoning map to reflect new commercial and industrial area designations” contained in the plan.

Aside from its contention that noncommercial uses are incompatible in the West Lincoln Highway corridor, based upon the comprehensive plan, the City makes no argument that Living Word failed to meet the requirements for a special use permit under the City’s zoning ordinance or that the denial of the church’s special use application was otherwise justifiable. As explained above, the decision to deny the permit application cannot be sustained solely on the ground that the proposed use is at odds with the comprehensive plan. Because there is no other reason offered for denying the application, that denial is, by definition, arbitrary and capricious and one which “bear[s] no substantial relation to the public health, safety, morals, comfort and general welfare.” 
La Salle National Bank of Chicago v. County of Cook
, 12 Ill. 2d 40, 46 (1957). We therefore hold that the city council erred in denying Living Word’s application for a special use permit.

In so holding, we do not mean, in any way, to diminish the severity of the economic problems facing the City or the City’s need to address these problems by changing its zoning regulations. Our holding is simply that, if the city council wishes to unconditionally remove all noncommercial uses from the West Lincoln Highway corridor, it must amend the City’s zoning ordinance to reflect that intent, and it must do so according to the amendment procedures set forth within the zoning ordinance.

Other Issues Relating to the Special Use Permit

In light of our disposition of this appeal, we need not address Living Word’s contentions that the City violated the Illinois RFRA and the church’s constitutional rights when the city council denied the church’s application for a special use permit.

Circuit Court’s Order of February 26

Living Word makes an additional argument that the appellate court erred in holding that the trial court was without jurisdiction, on February 26, 1998, to modify its original order of December 12, 1997, because the City had already filed its notice of appeal. However, because Living Word failed to raise this issue in its petition for leave to appeal, we hold that the issue is waived. 
Federal Deposit Insurance Corp. v. O’Malley
, 163 Ill. 2d 130 (1994). We therefore affirm the portion of the appellate court’s judgment that vacated the February 26 order.

CONCLUSION

For the foregoing reasons, the appellate court’s vacation of the February 26, 1998, order is affirmed; the judgment of the appellate court that the trial court grant the injunctive relief sought by the City is reversed. The judgment of the circuit court denying the City’s request for a permanent injunction against Living Word is affirmed; the circuit court’s entry of its February 26, 1998, order is reversed, and that order is vacated. The cause is remanded to the circuit court to enter judgment ordering the City to grant Living Word’s application for a special use permit.

Appellate court affirmed in part

and reversed in part;

circuit court vacated in part

and affirmed in part;

cause remanded.

JUSTICE GARMAN took no part in the consideration or decision of this case.

FOOTNOTES
1:     
1
The recently enacted federal Religious Land Use and Institutionalized Persons Act of 2000 (42 U.S.C. §2000cc 
et seq
. (2000)) is not at issue in this case.

2:     
2
The term “comprehensive plan” is sometimes used to refer to the zoning “plan” represented by the zoning ordinance itself. See generally C. Haar, 
In Accordance With a Comprehensive Plan
, 68 Harv. L. Rev. 1154 (1955). The comprehensive plan at issue here is entirely separate from the City’s zoning ordinance and is of the type described in section 12 of the Illinois Municipal Code. See 65 ILCS 5/11–12–4 
et seq
. (West 1994) (granting municipalities the authority to create plan commissions and comprehensive development plans).

3:     
3
Columbus Park
’s first amendment analysis is of questionable precedential value, given the United States Supreme Court’s decisions in 
Sherbert v. Verner
, 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963), 
Wisconsin v. Yoder
, 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972), and 
Employment Division, Department of Human Resources v. Smith
, 494 U.S. 872, 108 L. Ed. 2d 876, 110 S. Ct. 1595 (1990), all of which post-date 
Columbus Park
. See also Comment, 
Justice Douglas’ Sanctuary: May Churches Be Excluded From Suburban Residential Areas?
, 45 Ohio St. L.J. 1017, 1022-25 (1984) (discussing state court zoning cases that applied the free exercise clause prior to 
Sherbert
). Without expressing any opinion on the correctness of the decision, we note that 
Korean Buddhist Dae Won Sa Temple v. Sullivan
, 87 Haw. 217, ___, 953 P.2d 1315, 1343-47 (1998), provides an example of a court applying contemporary free exercise principles to a case involving a zoning variance.